Your Honors, and may it please the Court, Randy Feeler on behalf of Petitioner-Appellant Tracy Hampton. With me at Council table is Assistant Federal Public Defender Stacey Newman. I would like to reserve 7 minutes for rebuttal. We'll try to help you, but keep your eye on the clock, if you will. Thank you, Your Honor. I'm going to begin with the ineffective assistance of counsel during the guilt phase claim, and then proceed to the Brady claim as it relates to George Ridley. Before you do that, may I ask you, as you know, the Court sent a focus notice to both parties, and we're going to ask you to start with that. I know you have an order of things, but will you please, within the first few minutes, give your answer to the Court about the focus order, and whether these cases we cited have an impact, and if so, what it will be on this case? Well, they certainly have an impact, Your Honor. I will not deny that. And I'm going to take it, I'm going to focus on the three claims that I'm focusing on today. So the ineffective assistance during the guilt phase, the Brady claim, and the ineffective assistance during the penalty phase. As to the ineffective assistance claims, my focus today is primarily going to be on the claims as they were presented to the state post-conviction court. And so, insofar as Shin, well, Shin doesn't affect that portion of the claims. Obviously, as to both those claims, we raised arguments under Dickens v. Ryan, and I will concede that Shin dramatically affects the path to relief for those arguments. However, I want to emphasize that this is a case where we requested a Ryan stay from the district court, and the district court denied that stay request. And so, I think it bears emphasizing that Shin called great attention to the importance of exhaustion, to the importance of allowing state courts to hear claims in the first instance, and we were deprived of that opportunity. Something that, which we raised as an uncertified issue, but also I think could be fairly encompassed within the certificate of appealability as to those claims. I think, if I recall correctly, the district court concluded that the claim that you wanted to stay in a bay for had absolutely no merit. Is that correct? Yes. We raised two claims as part of our stay request. We raised Mr. Hampton's actual innocence, and we raised Mr. Hampton's Brady claim. The difficulty, I think, with the district court's reasoning is that we only needed to show colorable merit in support of our Ryan's motion, and the district court found that both claims lacked any colorable merit, which obviously is a point we're disputing. As to the actual innocence claim, I appreciate that there are difficulties in raising a constitutional and effective assistance of trial counsel, or I'm sorry, a constitutional claim of actual innocence, but that claim also encompassed an ineffective assistance of trial counsel claim. And so, I think the colorability of those claims still should have met the low bar raised by, required by Ryan's. But the Brady claim was based on, in part at least, the PSI report for Ridley, correct? That's correct. And I thought the district court said, well, you had that, or not you, but the defense had that in their hands, and so that's why, and it wasn't presented to the state court, so there was, so therefore it was barred. Do I have that correct, or? Yes. And I apologize, I don't think there's a way to make this simple. My colleagues told me to try to simplify, so I'll do my best. I think there are two separate questions here. There is the question of diligence under 2254E2. And yes, state post-conviction counsel had a copy of the PSI. However, the challenge with state post-conviction counsel in trying to raise a Brady claim at the point that state post-conviction proceedings started is that his Brady claim would have already been procedurally defaulted under Arizona law. And bear with me, I'm going to talk about the Arizona rules of criminal procedure for just a couple minutes. Under Arizona rule of criminal procedure 24.1, a defendant can file a motion for, I'm going to get this confused, I think a motion for a new trial, which can raise as a basis prosecutorial misconduct. But the deadline for that motion is 10 days. The PSI in this case did not get filed until 15 days after the guilt verdict in the case. And so that motion would have been precluded under the timeline for 24.1. So wait, just, so they did not have the PSI when Ridley was testifying? They did not have the PSI when Ridley testified during the guilt phase. Well, and to be fair, they also did not have it at the time that Ridley testified during the penalty phase. The material difference between the two different times that Mr. Ridley testified is that 15 days after the guilt verdict in this case, the PSI was filed in Mr. Ridley's case. And as far as I understand, at that point, anyone could access the PSI as a public record. And as appears to be the case for post-conviction counsel. Correct me if I'm wrong, and I may be struggling with the same thing my colleague is. I thought, I know that there were three counsel, at least in the penalty phase. And I thought that the senior counsel did have the PSI on a timely basis. Is that wrong? The record does not bear that out, Your Honor. And both testified to that effect, he just didn't think it was important. And the second tier didn't know about it. And you are making a point of that. But am I wrong that the senior counsel did have it? My reading of the record is that the senior counsel did not have it. But the post-conviction counsel did. Post-conviction counsel did have it. Because he's the one who said he didn't think it mattered, right? Or at some point, or he apparently didn't think it mattered because he had it and didn't use it. So I want to clarify, I think, between different buckets of evidence. There is a large amount of evidence in support of the third party defense that the senior counsel had access to and failed to turn over to the junior counsel, who was the one in charge of presenting the third party defense. This is at the penalty phase? This is at the guilt phase. Guilt phase, okay. Separate from that is the Ridley pre-sentence investigation. As far as we know, trial counsel, neither trial counsel ever accessed the pre-sentence investigation. And that is borne out by the declarations that we received from both trial counsel that said basically, we never got this. We believe it was Brady. If we had it, we would have used it during trial. And then there's sort of the third separate question of post-conviction counsel had a copy of the pre-sentence investigation in his file. However, he did not know he had it in his file. And so, in his declaration, he indicated, had I known it was in my file, I would have used it. I think that this would support a Brady claim. But he did not know it was in his file and so never presented it to the Supreme Court. Oh, I remembered that wrong then. So he thinks that it was apparently in his file, but he's saying he didn't know that. But it sort of doesn't matter because the problem I think is that it wasn't the failure to disclose that prevented the PCR counsel from using it. To the extent there needs to have been some failure to disclose that actually is the cause of it not getting used for Brady to be of claim. It wasn't the cause of it not being used because he had it. Correct. But I think the cause even goes back farther in time because, and this is where the 2254E and diligence gets complicated. Trial counsel could have accessed this report after it was filed. Post-guilt verdict, but before the penalty phase verdict. And after the penalty phase verdict, counsel could have filed a motion to vacate judgment that would have been timely and allowed the Brady claim to be considered by the Arizona courts. But because trial counsel failed to do that, it was that the Brady claim was already procedurally defaulted when state post-conviction counsel started the case. And so here we have a situation where post-conviction counsel is, we can't attribute lack of diligence to post-conviction counsel because the claim is already procedurally defaulted. And then trial counsel's lack of diligence is not attributable to Mr. Hampton because trial counsel is constitutionally mandated counsel as distinct from state post-conviction who is not constitutionally mandated. So at the end of the day, and I'm interested that you don't have to tell us why, but I would have thought you would have focused more on the Dupuy claim than the Brady claim, but you seem to be focused on the Brady claim. But in any event, doesn't this all roll into materiality? And the district court ultimately said this wasn't material because whatever additional impeachment could have been done, there was impeachment of Ridley. He was not, I mean, he was not a star witness. I mean, he was a main witness, but he wasn't exactly like an unimpeachable witness. And the jury apparently had questions about him in part because of the cross-examination that had been done. And so this just wouldn't have made a difference in the trial. Isn't that ultimately what the district court said? That is ultimately what the district court said. And I don't want to let my lack of emphasis on the Dupuy claim suggest... You don't have faith in it. Yeah. It's a very strong claim. I was just choosing the claims that I thought might garner the most interest from the court. But Your Honor's recitation of the district court's ruling is correct. However, in this instance, the district court erred because the district court read the pre-sentence investigation as cumulative evidence. And because Ridley had been so impeached, the additional impeachment wouldn't have mattered here. But the district court, I think, overreads this court's cases. And specifically in the cases where this court has held that Brady evidence is cumulative, what it tends to look like is evidence that is actually duplicative or almost duplicative. And here, the pre-sentence investigation provides an additional motive that Ridley had for lying on the stand. Specifically, that he had this obsessive need to continue stalking his ex-wife. You know, with respect, counsel, you're a very good lawyer, obviously, and you're doing your job. But I look at this witness. I mean, he was impeached up one side, down the other. It's hard for me to imagine that the jury would have believed anything that he said based on the impeachment that did occur. Why was the district court, I mean, the trial judge, wrong in concluding that what was in the PSI really didn't matter? It didn't add anything in terms of the credibility of that witness? What's your response to that? My response is that knowing, I think there are sort of two different things going on with Mr. Ridley. There is what he was actually impeached about, which is essentially that he's getting this deal and he's kind of like every jailhouse informant has the problems that a jailhouse informant has. And then on the other hand is this obsessive need he has ostensibly to continue pursuing and victimizing his ex-wife. What does that have to do with this case or his testimony? Well, it's motive testimony for his reason for falsely testifying against Mr. Hampton. It's just hard because everyone has a motive to get out, right? And so it's an additional motive to get out. But people have all kinds of motives why they would rather be free than in prison. So I think it's a challenging argument to say that that piece made a big difference. I mean, it also had the information about everyone saying that he lies about everything and he knows how to work the system. That part seems maybe more compelling as additional evidence to me personally than the additional motive to want to be out. I agree, Your Honor. And I think it's a package and trial counsel, if they had this report as they were constitutionally entitled to have, they could have cross-examined Mr. Ridley on all of these matters. And I think, too, I understand the point that he was cross-examined a fair amount during trial. But I think we have to look at how the trial actually played out and how the state emphasized its case during closing arguments. And I think it's very difficult to deny that the state viewed Mr. Ridley as one of its most important witnesses. But with respect, I think my colleague's reference to materiality is what really, for me, is important here. A good lawyer, such as yourself, can pull out of a PSI all kinds of things, all kinds of things. But the reality is our case law does not require that every single thing that's in there that could conceivably have been used to impeach the witness be used. And in this case, as I look back on it and see what you're referring to, I don't see what difference it would have made. And if I put myself in the status of the state trial judge, I can see why the judge would say, this isn't really material. It doesn't really help anybody. What am I missing? Well, I just want to make sure we're on the same page. The state court never ruled on this claim. But I understand the point to be, what about materiality? And I think that because this was not a strong case to begin with, even setting aside the Brady evidence, you had Missy Ross, who defense counsel not subtly accused of being under the influence of methamphetamines at the time that she was testifying. Everybody seemed to be on meth in this case, were they not? There are a lot of witnesses who... Perpetrators, it's a meth haven. There seem to have been a lot of methamphetamines in this case, Your Honor. In addition to her drug use, her testimony was inconsistent with a key piece of forensic evidence, namely where Mr. Finley's body was in relation to the couches at the crime scene. But with respect, counsel, again, you know, your client, there were all kinds of physical evidence, blood, there was all kinds of other things independently that showed his involvement. Was there not? No, Your Honor. There was no forensic or physical evidence tying Mr. Hampton to these crimes. The two witnesses that connected him to the crimes were Missy Ross and George Ridley.  Can I... So we've taken you almost half your time on the claim that is not the claim you wanted to start with. And I think your strongest claim is IAC during the guilt phase. So that's where you tried to start. I think you're kind of getting there now, that the evidence, there's no physical evidence. There's only these two witnesses who are both very impeached. Can you talk about why you think, I think you want to say that the third party guilt evidence like really should have come in because it's such a weak case. Is that where you would have started if we hadn't derailed you? Yes. Although I'm happy to have talked about Shin early. So I want to focus on what the jury did not hear. Timothy Wallace was the biggest meth cook in the Phoenix Valley. He was Chuck Finley's supplier. And Mr. Finley was in trouble. His criminal aspirations were failing. He owed Mr. Wallace a lot of money. He had been twice arrested for his identity and check fraud scheme. And both times he had not been charged. And shortly after the second time he had been arrested without being charged, Mr. Wallace was arrested coincidentally at the same time that he had a large amount of freshly cooked methamphetamines. After that happens, Mr. Finley's two arrests without charges suddenly looked very suspicious. And Mr. Wallace starts going around saying that he knows that Mr. Finley is a snitch and that once he proves that Mr. Finley is a snitch that he's going to smash him. And then after the murders in this case, Mr. Wallace confessed to shooting Mr. Finley and Ms. Ramsdell for being snitches. Three people heard that, heard Mr. Wallace confess. But the jury only heard from one of those people and the jury did not hear any of the background evidence that would have corroborated Mr. Wallace having made the confession or Mr. Wallace's motive for shooting Mr. Finley and Ms. Ramsdell. And as Your Honor alluded to, and this is a case where the two state's witnesses were heavily impeached and the case was not strong. Counsel was deficient in failing to present this additional evidence which showed that not only did Wallace confess, not only did one person hear Wallace confess, two people, two additional people heard him. Not only did he confess, he had motive for committing these homicides. And not only did he have motive, his motive was corroborated by the circumstances of Mr. Finley's and his arrest. What is your, so how does this relate to your ineffective assistance of counsel claim? Because I thought your ineffective assistance of counsel claim focused on failure to get like mental health evidence in and I guess there's additional evidence of Wallace's involvement. What exactly are you saying they didn't put in to evidence about his involvement? Because the jury did hear some of that. Yeah, and I just want to clarify, we also have the ineffective assistance of penalty phase counsel claim, which is all the mental health evidence that Your Honor just alluded to. So this is not related to that? This is not related to that. So specifically, the specific evidence that they should have put in, the two additional witnesses who heard Mr. Wallace confess, and then the evidence supporting that Mr. Finley had twice been arrested without being charged and Mr. Wallace's arrest, which the state post-conviction counsel suggested could have come in from the officers who made those arrests. There were also witnesses who were not called who could have corroborated that it was well known in the community that Mr. Finley owed Mr. Wallace money and that Mr. Wallace was Mr. Finley's supplier. So that is the category of evidence that we're talking about. I was not totally sure whether your argument was that counsel knew about all of this and the deficient performance was not presenting it, or whether the deficient performance was not investigating enough, or whether you're saying both. A little bit of both, Your Honor, because part of the deficient performance here was this dynamic between the senior attorney on the case and the junior attorney on the case. The junior attorney on this case, Maria Schaefer, was the one who was in charge of the third party defense. And she testified during the state post-conviction hearing that she was unaware of all this evidence, that there was no strategic decision to not present this evidence, and that if she had known about the evidence, she would have presented it. In a different... How do we deal with that, though? If you have... I think there were three lawyers all together involved, but if you have the lead lawyer who has it, doesn't think it's that important, doesn't deal with it, second lawyer said, well, if they had it, we'd have done something different. Under Strickland and its progeny, how do we deal with that? Do all the lawyers have to be in agreement? What happens if they disagree with each other about whether it would have been used or not? Well, and I think Mr. Logan's, Mr. Logan being the senior attorney, and forgive me, counsel, or forgive me, Your Honor, I'm only aware of the two counsel, Maria Schaefer and James Weldon. Perhaps I misread it. There was an earlier counsel, but that counsel had a conflict. So two people, they seem to disagree with one another. So under Strickland, you got a two-part burden. On the first part, how do you determine whether there was performance that's so far below the standard required that you've got the first prong satisfied? What do we do in this case? So I think an important point of clarification is the testimony did not reflect disagreement the two lawyers. What the testimony reflected was Ms. Schaefer's view that there was no strategic decision. This information was never given to her. And then Mr. Logan could not recall. He did not remember. Okay, so taking that then, how do you satisfy the first prong of Strickland? What is so deficient in what you just recited that it meets that first prong? So I think the first thing is this Court has recognized that when the defense chooses to present a particular defense, they are charged with presenting that defense effectively. Clearly in this case, they were interested in third-party defense because they presented Mr. Sandin's testimony. But then to not present any of the other evidence that would have supported this, and for the person in charge of that defense to not even know about this evidence, that is deficient. Well, let me ask you this. If I recall correctly, Mr. Logan had like 30 years' experience as a capital defense lawyer. The second-chair lawyer had a lot. She was a specialist as well. These are not inexperienced people that have no idea what they're doing. So even if they didn't present it and one didn't even know about it, how does that meet the standard for the first prong of Strickland? My understanding is it's a pretty difficult standard to meet. You've got to show these are really, you know, dum-dums. They really don't do their job. And had they done their job, you know, everybody would know that they'd blown it in this case. I don't see that. What am I missing? Well, I think two answers. First, although Ms. Schaffer had, the Moore Junior Counsel, had some experience under her belt, this was her first time doing a capital case. It was also her first time working with co-counsel. And Mr. Logan, although he had a fair amount of experience, he also had a significant amount of administrative duties. And so I would gently push back that experience alone suggests strategy in this particular case. To answer the... Forgive me. Even if we don't say strategy, let's put that to the side. As I understand it, to meet the first prong of Strickland, you've got to show that really, if you take the whole community of lawyers that would handle these kind of cases, everyone would just, their jaw would drop at what these people did. I'm not seeing that. What am I missing? So I think two things. Respectfully, I think most defense lawyers' jaws would drop. And I think, I wouldn't go so far as to say that Your Honor is missing something, but I think what I would call Your Honor's attention to is the confession that was presented was essentially a somewhat random person saying, I was kind of randomly in this room where this other guy who had just met Timothy Wallace confessed. And he said he did it because Mr. Finley and Ms. Ramsdell were rats. No other evidence to make that a believable confession. The evidence that's missing is Chuck Finley owed this individual money. Chuck Finley had been arrested two times without being charged. And so this idea that Mr. Wallace believed that Finley and Ramsdell were informants is extremely believable in light of that timeline and that evidence. And the two other confessions. I guess I think those are the more, it's like if he confesses to three different people, I know there's some question about whether the other two are the same incident or more than one incident because there's different accounts of where it happened, I guess. But it seems like there's at least three confessions. Yes, and that's right. And the other two witnesses would have, in addition to the confession, been able to provide a fair amount of the background context related to Mr. Finley's relationship with Mr. Wallace. And I see I'm past my time, so I... Do you want to save the rest of your time? I would like to, Your Honor. Very well. Thank you. All right. We'll hear from Mr. Lewis from the state. Thank you, Your Honor. May you please... Forgive me. I'll try my best not to have that happen again. If I could start with... What is that? I've never had that happen before. Kelly, we're hearing some noises at lecture. I'm afraid I might be radioactive. Kelly, can you hear me? She's talking to one of our tech people to find out. That was the voice from above that we heard earlier. Why don't you go on, Steve? Sure thing. Yeah. So, if we can start with Ramirez, McLaughlin, and Lee, and as the Court most recently signaled to the parties, those three cases and their application here do quite a bit of work. The first one would be Ramirez from the Supreme Court, and that really defined, I think, where we are now with 2254E2 and how difficult that standard is to meet. You know, I can walk through the claims and how E2 affects those claims. For the Brady claim, E2 affects, I think, the consideration of the PSR at all, because, of course, we've got Strickler and we've got Banks v. Dretke, and we've got this concept that a Brady violation can serve as cause to overcome procedural default. But as the Court noted earlier, PCR counsel had that pre-sentence report, but PCR counsel didn't raise the claim. Then we're more squarely . . . Can you clarify? Do you have anything to add on the timing? Because I think at least I came in a little bit confused on it, and do you agree with opposing counsel's rendition of when those were in their possession? Yeah. No, I think I agree for the most part. You know, the pre-sentence report is a court record. It is ordered by the court. It is created by a probation officer who works for the court. It's publicly available after it's filed. That's all clear. It wasn't filed. When was it actually filed? I believe May 15th of 2002, so after the guilt phase testimony had concluded. You know, just something collaterally . . . But before the penalty phase? Yes, before the penalty phase. It was filed in George Ridley's case. I mean, you know, if you can back up and think about trial counsel's awareness of George Ridley, they were very aware of George Ridley. He was a key prosecution witness in the case. They knew about him. They knew about his priors. And they knew about the people involved with the priors. Trial counsel could have made that investigation to perhaps talk to the victim in the stalking offenses. That didn't happen. We don't know why that claim wasn't raised. But it's questionable whether or not that victim could have come up and said, don't listen to George. He's my ex-husband. He stalked me. He did these violent things to me. Maybe she could have gotten up and said . . . Those convictions would have been public record? Is that right? Well, they would have been disclosed. And there's no dispute here that they were disclosed to trial counsel. So they had George Ridley's criminal history and knew the basis of those convictions. And as the court noted, George Ridley was pretty thoroughly impeached. And one thing I wanted, and as I was reviewing this case to prepare for today, there's sort of a delineation in the type of impeachment. So in the guilt phase, George Ridley is impeached with his motive for testifying. OK, you're in jail garb. He's cuffed at the witness stand. So the jury's already aware something's going on with this witness. But then he testifies. Yeah, I've got these charges. I'm facing a lot of time. I'm testifying because the state's going to make a favorable recommendation in my case pursuant to a plea agreement that they're giving me to testify under. So the jury's got all that information. They know he's a felon. They've got every reason in the world not to trust him. And so this goes to the cumulative nature of what's in the pre-sentence report. This sort of concept of this additional motive to fabricate testimony just doesn't carry a lot of water. He had all the motive in the world to fabricate testimony. And the jury could have thought about that. He wanted to get out of jail. And he wanted to avoid prison. And that was thoroughly discussed with trial counsel. So I agree with you that you could have a good argument that it was cumulative. But this leads to the next problem with the case. So it's very odd to have the state basically saying we had two witnesses. There's no physical evidence. One of them is completely on drugs. And the other one is completely impeached. And so the evidence that this guy who was going to get the death penalty committed this crime is two witnesses who are totally not credible. And you're basically admitting that in your briefs. And so then that leads me to the IAC of the guilt phase claim. Because if you've got a case with so little evidence, I really don't understand how it's not deficient performance to admit a third party's confessions to the crime at question. Because there's not that much evidence about the petitioner doing the crime. I understand the way you're characterizing it. You know, it is a compelling argument. But I'd like to push back a little bit respectfully on Ms. Yarras' testimony. Because I went back and I read her trial transcript. And her use of methamphetamine was explored during her testimony. And trial counsel, this is what you would try to do, right? You try to say, well, you were on drugs. You don't remember what you saw. Maybe you hallucinated it. Maybe you saw something else. And she was unequivocal in saying that something like that sobers you up. She was absolutely certain about what she saw that day. But then why don't you present Doar, who says she said to Doar, she doesn't know who did it? I think what we're dealing with here is, so we do have the witness that was presented, right? For this Tim Wallace third party culpability theory. But that person didn't impeach Ross. And Doar could have. And I don't understand why they didn't present Doar. I think, so as counsel noted, the person who testified this was Sandin, was sort of on the periphery, not involved in this group of people that were constantly doing drugs together and committing various crimes. And this person was this person's supplier and all these things, all of this drama that's happening in this group. Trial counsel made a reasonable strategic choice not to present people that had that kind of baggage. Sandin didn't have any of that. There was nothing to impeach that person about because they were on the periphery. But because of that, they're also weak. I mean, the people who really knew all of these people and knew what was going on, I mean, at least two of them say it was Wallace. Yeah, I understand your point, Your Honor. I just think it was a reasonable strategic choice to present the person without this sort of baggage, like Kiva Armijo, like witness. I mean, this person didn't want to testify under their true name because of all of the things that could have been brought up. There's a lot going on here. And I think it was a reasonable choice to only present this witness who didn't have any of that baggage. But to pull you back even more... Does that go... Help me understand how we analyze this, because does this go to cumulative? I mean, is it part of the argument? Some of this evidence was presented. Yeah, there might have been more evidence, but just because you didn't put in three witnesses and you put in the best witness, may have been the best witness. I mean, you have to make decisions all the time about who's going to be the best witness. Is that the basis that the state is suggesting we should analyze this under and say this is cumulative? So that's why it wasn't ineffective? Right. So, you know, that it was cumulative, but also that trial counsel had reasonable choices about which witnesses to present based on the problems that their testimony would have had and based on the way the state would have challenged their testimony. I mean, you know, counsel's always thinking in the background that they have to maintain credibility with the jury. And so if you have a real shot of convincing the jury that Tim Wallace or some other third party is the actual responsible person for this in the face of eyewitness testimony from somebody who testifies clear-eyed that, yeah, I was doing drugs, but that sobers you up quick, that's reasonable. And if I can pull you back on the IAC claims, we're looking at this under subsection D. And we have to talk about whether or not the PCR court unreasonably applied than existing Supreme Court precedent. And that didn't happen here. Can I ask you this following up on my colleague's question about Wallace? You do have these three people that say that it's a confession that he did it. What evidence, if any, was presented to the jury from those people about Wallace's alleged confession to the murder? I think it was just the Sandin witness. It was the one witness who testified about not knowing Wallace, hearing him talk about committing these killings, and then trying to find out who he was. I think he said he went out to the parking lot after Wallace left. One of the three people that claimed to have heard him confess did get that information to the jury. Yep. But it was from different incidents of confessions, right? I'm not sure, Your Honor. If I could push back a little bit on calling this a confession, Tim Wallace, by all accounts, is a criminal. He was a drug dealer. He was a violent person. I would call these statements to these third parties bragging rather than confessions. This wasn't Tim Wallace unburdening himself and trying to say, oh, I'm so wrecked because I committed these murders. He's saying, yeah, I did that stuff to those people. Don't mess with me. This is sort of in furtherance of what he's doing out there in the community. So I just have a little bit of an issue calling it a confession in the sense of that word. Was that presented to the jury, that theory right there, through cross-examination or something? I'm just trying to maybe give the court a little context to look at his statements to third parties. But the answer has to be no because they weren't... This is the whole point, is it wasn't presented to the jury, right? These other people who said he said this weren't presented. The jury didn't know about them. Just through Sandon and then I believe through his contemporaneous notes, trial counsel James Logan during the evidentiary hearing, it was clear that he was aware of those witnesses, Kiva Armijo and I think one other. And he chose not to call them. And again... But the two people who heard the confessions were both women. I'm not sure it's that plausible that he was like, don't mess with me. I don't know. The setting you just hypothesized doesn't sound that realistic for who these witnesses were. And they were both kind of friends with him, weren't they? I mean, one of the victims in this case was a pregnant woman. And so that's kind of the world we're dealing with here that people would commit violence against women and pregnant women, which is a sad aspect. Well, Wallace, that's the point though. Wallace, you're trying to say... I don't know. I mean, we don't have any reason to think that Wallace was threatened by Ross or Armijo, right? By Misty Ross? Oh, sorry, Dorr. Dorr. Sorry, I didn't mean Ross. I meant Dorr. I'm not sure, Your Honor. But I mean, I understand your line of questioning and I understand, you know, what you're dealing with here and wondering why these... Why not present more, right? But my best answer for that is the witness that was presented was the one that could be presented with the least baggage. And that was trial counsel's strategic choice. Procedurally, what is the state's response to the point made by my colleague that here you have kind of weak evidence tying Mr. Hampton to the murder? You got three people who said that Wallace, in quotes, confessed to it, whether you characterize it as bragging or not. Under AEDPA, what is the state's best defense to the fact that that was not presented in a lot of ways to the jury? You said it was just the one. Well, you know, I think we shift back. So again, these two IAC claims, the claims are presented, so they're exhausted. But I believe there's some new evidence that's been used to bolster those claims in these proceedings. I think the Jennifer Doerr testimony, please don't hold me to anything. I'm new to this case. So I'm not totally clear on the line between what was presented in state court and what was presented in federal court. So in state court, my understanding is there's two things in the Doerr testimony. But in state court, it was presented that she heard Ross say, I don't know who committed these crimes. I think you may be right that Doerr hearing Wallace wasn't presented, I think, but they could correct us. Right. But there's at least the idea that Ross, I mean, so if you get rid of the jailhouse informant who's totally not credible, you've got Ross on drugs. And now Ross is telling Doerr, I actually don't know who did it. And Ross is the one who's the only evidence at that point. So that seems pretty important. And that was presented to the PCR court. Yeah. And so then you just have to determine whether or not that was unreasonable under Strickland and under Cohen v. Penholster. And I think that level of deference compels that the state PCR court got it right and can't lead to relief under AEDPA. I guess that's what, I wrote Penholster for our court, so I have a particular sensitivity to that.  I still think the court was wrong, but they controlled. But that's what I struggle with here is what showed up in the federal court that didn't show up in the state court can we consider? I think post Ramirez, we can't. You have to meet the strict requirements of 2254E2 and Hampton hasn't done that here. Yeah, I don't understand there. I mean, they do have some additional things they want to talk about and it's in the actual innocence. Other part of their claim claim. But as to this, it was presented in state court and we have the evidence in state court. I think they're making an argument that given the evidence in state court, this was not. Reasonable performance and it's hugely prejudicial because this case had no evidence and I'm really struggling with how we like what? How do you think? Oh, this is fine. This guy is going to get the death penalty and he really did it. What is the evidence that he really did it? Can you list it? I think that the evidence is Mr Ross's eyewitness testimony and I understand that she made statements later on to other people like door, but I think she was tested through the crucible of cross examination and she didn't waiver. She explained, but she wasn't cross examined with statements that she made. Apparently saying I actually don't know what happened. I'm not clear if that's pre trial or post trial from door, which could make a difference in this calculus. It might have been pre trial if we're talking about it. Well, I think it was. I think it was 2001, but I'm not positive. I remember that right. Which would have been pre trial. I think they would have been able to have this if they'd wanted it. That's the deficient performance, right? Yeah, no, you're right, Your Honor. I apologize for that. And I think we're just going to disagree on this, but I think Misty Ross even had she be confronted with these inconsistent statements because the one statement we're talking about from door is that Mr Ross didn't know who did it. There could be a lot of reasons for that, but it's not because she fabricated what she saw Tracy Hampton do. And that's just my view of the evidence, Your Honor. But from the perspective of Mr Hampton, that's deficient performance. Under Strickland, what's your analysis of that? How should we view that? I first, I think that the state PCR court reasonably applied Strickland as well as Colin V Penholster, and I understand the background on that, Your Honor. I think when the when the Supreme Court took that case and issued the opinion that they did, they adopted Judge Kaczynski's dissent. And in Judge Kaczynski's dissent, he focuses, he pulls from the objective reasonableness standard in Strickland and says that under this standard, you need to entertain the you need to entertain the range of choices counsel could reasonably make under the circumstances. And so I don't think that it was unreasonable for the state court to rely on that standard because it was reserved for some other, you know, level of double or triple deference. I think that's the Supreme Court's extension of what objective reasonableness means under Strickland. So from your perspective, because we're reviewing this case under EDPA, the very legitimate point that my colleague brought up doesn't change the result because we really can't go back and rewrite the script at the state court level. Enough was done to meet the Strickland standard under the first prong. Is that right? Right, Your Honor. And as far as deficient performance goes, I mean, it's true. James Logan had 29 years of trial experience. He was running the Office of the Legal Advocate. He was probably their most experienced capital defense counsel. He was not, you know, a fresh lawyer. Maria Schaffer was new to capital cases, but I believe from her testimony in the trial court or in the PCR court, she had 10 years of experience at that point. But in his testimony at the evidentiary hearing, Logan was clear. I was lead counsel. It was my call. And when you entertain the range of choices that counsel could reasonably make, it was reasonable for him to decline to call these people who had so much baggage and would not have been credible witnesses for the jury to consider. So in other words, from your perspective, notwithstanding the weakness of the evidence, tying Mr. Hampton, except for these two people, both of whom have real problems, one of whom, Ross, said basically in another setting she didn't know, that nonetheless, what was presented was presented. The counsel were not deficient in failing to get the other two to bring on the comment that Mr., with his name, Wallace had confessed to the wedding. I mean, the murder, is that right? You're right, Your Honor. The record is set. It's the state court record before this court. And it's consideration when looking under subsection D has to be limited to the state court. So I struggle a bit here in thinking about how to separate the deficient performance from the prejudice because it seems to me it kind of bleeds together in my head because what counts as reasonable performance may partly depend on what other evidence is there. And in this case, where the evidence is really weak, and I mean, you just said there's only evidence is Ross who was on drugs and contradicted herself. Why doesn't it seem like in that context, you don't worry as much about whether one of the witnesses was also on drugs or also knew the person because there's so little evidence you might as well put in that the one witness contradicted herself. The weakness of the evidence, which is usually like the prejudice, whether it would make a difference is usually a prejudice part. But it feels to me like it bleeds into whether this was a reasonable strategy. I see what you're saying, Your Honor. But that's not what Strickland endorses. Strickland doesn't say, well, if you could have done it and it really wouldn't hurt, you might as well have done it. It looks at whether or not counsel's actions were objectively reasonable. And then that's kind of the end of it. It's not like, well, you might as well. Yeah, I mean, I guess my question is, why is it objectively reasonable to worry about whether the two witnesses who could have really undermined the one witness who was the case had some credibility problems themselves? I mean, yes, maybe they had some credibility problems. And so that would be a reason if you had 50 other witnesses to put on some of the other 50. But in a case with almost no evidence, why don't you put on what you have? I don't understand it. It's a good question, actually, Your Honor. And it makes me think of something. The background at the trial was that trial counsel was doing everything he could to keep the jury from learning that Tracy Hempton was affiliated with the Aryan Brotherhood. And so trial counsel, in pursuit of that goal, which may have been the singular most important goal in the guilt phase, had to make a decision on whether or not to risk putting on other witnesses who could testify about his involvement or association with the Aryan Brotherhood. I think that's reasonable. Do you think that Doar and Armijo, the two we're talking about, knew that? I don't remember them having that in their transcripts. They could have. I'm saying this was at issue. There's a mistrial motion when George Ridley gets into some of that area. And there's discussion in the court press. But I'm saying this is in the background. And this is why trial counsel, I believe, or at least it was objectively reasonable for trial counsel to limit the witnesses being presented in favor of Hempton. I think that's objectively reasonable for trial counsel to try to keep that sort of collateral damage to a minimum. And so the more people... I'm sorry, can you just... I'm not sure I understand this. I know there was an issue about this in the penalty phase, but you're saying the Aryan Brotherhood issue was a big issue in the guilt phase? Why? There were motions in limine beforehand to limit or to preclude that type of testimony. He didn't want his client to be prejudiced in the face of the jury for his association. And in his view, his free exercise, his First Amendment right to associate with this, he wanted to keep it out and he worked really hard to do that. And so if you start introducing witnesses that are from Tracy Hempton's world, it's the risk of that happening goes up with every new witness that you present. And you also risk putting in front of the jury a lot of other prejudicial things that they might testify about regarding Tracy Hempton. I mean, I just think it's objectively reasonable for trial counsel to minimize that risk, the risk of prejudice that the jury could convict the client based on something other than the evidence presented by the state. I think that's an objectively reasonable. I just want that to sort of be before the court for context too, because it's through that lens that trial counsel operated and made the decisions that he made. So you're saying you're worried we're trying this by hindsight or looking back and saying, OK, well, you look at what actually happened here. Look at what Ms. Ross said or confusion on it. So on the number of weak witnesses that now it seems perfectly clear that they should have done something different. But at the time they presented the made the decisions at the trial level, what they did was appropriate and certainly within the level of performance to meet the first prong of Strickland. Is that right? That's right, Your Honor. And I mean, that's specifically what Strickland tells reviewing courts not to do. You know, there's a lot of different choices that could have been made, but under the objective reasonableness standard, what counsel did was objectively reasonable. How much of this claim relies on Logan's experience? I mean, you know, we're dealing with Strickland, obviously, which already gives deference. Is there something to this idea that we have a 28 year attorney? You know, does that require us to give more deference to these decisions? Or do we look into it the same as whether it would have been a new attorney? I mean, a reviewing court can't just say this is the most experienced capital defense counsel in the country. There's no way they could be deficient. Strickland talks about even the most, even the most experienced attorneys can render deficient performance. And even the newest attorneys can deliver constitutionally effective performance. That's not what really matters at the end of the thing. But you can consider his experience when you're looking at the decisions he made and why he made them. When you're looking at how he structured the case and why maybe Maria Schaffer's statements about not knowing about certain information, and if she would have known about it, she would have presented it. When you've got the dynamic of a very experienced first chair and a new, relatively new, second chair counsel, I think that dynamic is important when Logan says, or the evidence shows that he knew about something and chose not to present it. I think that's where the experience comes out. Is there anything in the record that suggested either counsel had focused on the disclaimer of Ross's knowledge and the, in quotes, confession by Wallace and decided not to present it? Can you ask again, Judge? What I want to know is, is there anything in the record that suggests that either of the lawyers, whether they specifically focused on the fact that Ross had disclaimed that she knew who had done this at one point, and secondly, that you had these three people who had allegedly heard Wallace claim that he did it. Was there anything in the record that suggests that they knew of these things and decided not to present testimony? Yeah. So there's two witnesses, I believe, regarding the Tim Wallace evidence. I think that's Kiva Arminjo, and I think that's the other one that was listed as witness. The evidence going to that is, there's contemporaneous memoranda from trial counsel regarding contacts. Trial counsel, I mean, he's done a lot of cases and maybe this is where you can consider the experience. This trial was kind of a drop in the ocean of his experience as a capital defense attorney. So he didn't have specific memories of talking to these people, but there are documents that were admitted in the state court showing that he did talk to them. So we can- I think the answer is no, right? Like, so we have documents that the senior counsel had about witnesses, about Arminjo and witness talking, but there's nothing where a senior counsel says the reasons I didn't present them are X, Y, and Z. He says he doesn't remember. And then the junior counsel says she didn't even know about them, right? Is that correct? I think that's correct. And I think that it doesn't matter at the end of the day because Strickland is an objective standard. And so what the reviewing court would look at is, okay, was the investigation done? Well, apparently it was done because these documents show counsel contacted these potential witnesses in some way. And then the court has to entertain the range of possible choices counsel could have made to not call those witnesses. And that's what the state court did. And that was reasonable under- So the fact that the lead counsel was aware of all these things, the three confessions in quotes, and Ms. Ross's disclaimer is sufficient, even though there may have not been an articulate decision strategically not to present it. The fact that it wasn't presented is shielded under Strickland. Is that correct? Certainly, you know, AEDPA and then Strickland. I mean, this is- AEDPA is the real catch here from your perspective. I think so, because, you know, finding that the state court unreasonably applied Strickland is a tough bar to surmount. And I don't think it can happen here. In your argument about the reason was probably about the Aryan Brotherhood. I'm looking at my notes on our Miho witness and Dorr. I don't see anything about them knowing that. Are you just- I just want the court to have that context for what was happening during the trial. And so if you go through the trial and you look at the mistrial motion made during George Ridley's testimony, if you look at the motion in Lemony to preclude that type of testimony, I think it gives context for why counsel made the decisions that he made. But you're just speculating that witness or Dorr or Miho might have said he had some affiliation with the Aryan Brotherhood. I think it's a reasonable strategic choice not to present people from this world because the prejudice of them saying something against your client, whether it's Aryan Brotherhood testimony, whether it's testimony about other violent conduct or drug use, the prejudice you risk from that is too much in terms of what you actually get from that witness. I think that's a reasonable strategic choice. And so I just bring that up now to give the court context for what the trial was like and the issues that trial counsel was dealing with. OK, you're getting close to the end of your time. Sure, Judge. What do you want to wind up with? What do you want us to have in mind from the state's perspective? So I think post Ramirez and as the Ninth Circuit has applied Ramirez and McLaughlin and Lee, 2254E2 prevents consideration of the new evidence to support the procedurally defaulted claims. I mean, the Brady claim is procedurally defaulted. Then I'm going to say it wrong. NAPU claim. I can't help it. The NAPU claim is procedurally defaulted. Cause and prejudice doesn't exist to excuse the default of those claims. The state PCR court reasonably applied Strickland and Cullen v. Pinholster in denying Hampton relief on the two IAC claims that are before this court. And the third IAC claim concerning George Ridley's pre-sentence report is procedurally defaulted without excuse. And under Ramirez, this court can't consider the statements from PCR counsel in applying Martinez to find cause and prejudice to excuse the default. If there are no further questions. Questions by my colleague. In my last five minutes. Thank you very much for your presentation. Thank you, Your Honor. All right, Mr. Fiedler, you have some time to rebut. Thank you, Your Honor. I have about five points I'm going to try to get through acknowledging I may not get through all of them. First and foremost, I want to clarify the ineffective assistance of guilt phase claim and all of the evidence that we have been discussing this entire time. None of it is barred by Shin. Granted, Mr. Hampton did present new evidence in federal court. That is not the evidence we've been talking about today. So Shin has no effect on the material facts related to the ineffective assistance during the guilt phase claim. So this is going to the additional witnesses Dewar and Armijo. Sorry if I have that wrong. And so Armijo, the witness who chose to keep her identity anonymous. And I just want to note that the reason she wanted to keep her identity anonymous is because she was afraid of Tim Wallace and Sean Blue Giesland, the person who... Doesn't this go to the whole? I mean, there's it seems like there's layers that go into here. First of all, we have a 28 year veteran, if you will. And again, that doesn't mean that these claims can't have merit. But they did investigate this, right? I mean, they investigated. They knew about this stuff, or at least Logan said he knew about this stuff. And so really what we're at is why didn't they call him? And it seems to me that there's and I'd like to hear your response to each of these. Number one, these witnesses did not seem exactly forthcoming and willing to testify. In fact, witness fled, right? So I mean, doesn't that suggest she wasn't willing to testify at all? So I'd like to hear that. And then secondly, the strategic decisions not to call them. And I think that does go to Logan's experience where he should be able to evaluate these things. And there were some written notes that he didn't think that they might be credible. So maybe you could take those two things in order. So I'll start with the question of whether the witnesses seemed forthcoming or the concern that the witness disappeared. Logan, during his testimony, during the PCR, he referenced the fact that you can always compel a witness to come. And I think the answer here has to be this witness who heard a confession that could corroborate another confession and could corroborate that Timothy Wallace committed this offense is somebody who they should have found and compelled to appear. What if they couldn't find him? Excuse me? What if they couldn't find him? Then they seek a continuance. But the evidence does not reflect that they were looking for this witness. The record does not reflect that they made a strategic choice about witness. And so there's correspondingly no record that they made a choice to give up on looking for her because they couldn't find her. But I guess you're right that they could compel him. But the willingness to testify, can that be taken into counsel's his experiences? Yeah, maybe I can compel them to testify. But if they're not willing to testify, that just adds to the problems that I'm going to face with them as a persuasive witness. So I'm going to say yes. But yes, but the problem with applying that reasoning in this case is Logan's testimony wasn't that he did engage in that reasoning. His testimony was that in general, that's one of the things he would consider. Maria Schaefer was unequivocal that she would have presented these witnesses. And so we have Mr. Logan, who doesn't really remember what happened, but offered two general, generic observations about what he would normally do, who I would emphasize, again, was very busy with administrative duties in other cases. And then we have the testimony from Maria Schaefer about actually there was no strategic cost. We have affirmative evidence on the one hand, and we have sort of this noncommittal, I don't remember, but here are my general concerns. And were there contemporary notes, contemporaneous notes from Logan? There were. Candidly, I don't recall them expressing concern about these witnesses. I didn't remember that either. But my memory is they just... I thought he wrote at one point, I was just looking for it. I thought he wrote, you know, drug use and concern about credibility or something like that. It would not surprise me if drug use were noted as to the witnesses. Oh, as to Armijo, he noted halfway house has warrants. I mean, I don't know what you draw from that, but that suggests that that was indicative of his idea that at least as to Armijo, that he might have discounted his testimony because of credibility issues. Yes, but an equally plausible reading of that is that he was just noting what a potential state impeachment would be. And I think the problem is because we don't have testimony from him about what his actual thinking was, he may have not made any decision. Oh, right, but doesn't that... I mean, that seems to fold back into the Strickland hurdle that you have, which is, I mean, we look at the full range here. I mean, let me ask you this too. How much direct knowledge... I mean, we're acting like, oh, wow, these guys said... These guys were willing to testify that he directly told them that he killed him, you know, that he owed money. How much of this was based on actual knowledge? Perhaps that... Perhaps that the... The confession was direct knowledge, but as far as who owed who, it seemed like there were some ambiguous statements that Findlay owed money to someone who was in the house. I want to make the big picture point that I think is most important, which I haven't gotten to in answer to your question. First is Strickland does not contemplate post hoc reasoning. That's Rompilla. Richter acknowledged that point. And so a lot of the exercise that we're going in, I don't think is countenanced by Strickland, which said if you don't post hoc engage in rationalization of what trial counsel did. We have Logan's testimony that he doesn't really remember. And we have Schaefer's testimony that there was no strategic decision. Now, your time is up, but let me ask my colleagues, do you have additional questions? We could talk about this case forever and ever, but do either of my colleagues have additional questions? No, other than what I just asked. Do you need additional response on that? Well, I can't remember where we ended it, but I thought I thought you were. I thought you were in the process of answering. I was that your honor asked the sort of that big picture question. And then I lost thread on what I had a specific fact answer. Oh, direct knowledge. So the confessions, obviously, there's direct knowledge. I mean, I think. The record reflects that people heard Wallace saying Finley owes me money. I think Finley is a snitch. And so I would view that as direct evidence. Admittedly, some of it was akin to like reputation evidence of what was going on between the individuals. But I think enough of it was direct evidence that it would be admissible. OK, very well. Thanks to both counsel for your argument. We appreciate it. The case of Hampton versus Shin is submitted and the court stands adjourned. I'll rise. This court for this session stands adjourned.
judges: SMITH, FRIEDLAND, NELSON